UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COMMONWEALTH LAND TITLE INSURANCE COMPANY, Nebraska corporation,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>SUN VALLEY CREDIT, LLC., an Indiana limited liability company,<br><br>　　　　　　Defendant. | Case No. 1:13-CV-00113-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court in the above-entitled matter are Motions for Partial Summary Judgment filed by both sides. (Dkt. 33, 34.) The parties have filed their responsive briefing and the matters are ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 6, 2008, Plaintiff Commonwealth Land Title Insurance Company ("Commonwealth") issued a lender's policy of Title Insurance (the "Policy") to the Defendant, Sun Valley Credit, LLC ("Credit"). The Policy was issued in relation to Credit's issuance of a loan to DeNovo Independence, LLC ("DeNovo") who intended to use the loan to purchase certain real property (the "Property") located in Blaine County, Idaho.

The face value of the Policy was $8,000,000. That amount was increased by endorsements to $12,000,000 – the Policy included a Zoning Endorsement and an Access Endorsement. DeNovo defaulted on its payments to Credit and Credit secured foreclosure and became the owner of the Property. Thereafter, on or about December 20, 2012, Credit made a claim upon Commonwealth for payment under the Policy. Commonwealth has denied the claim asserting that Credit has not suffered any loss or damage covered under the Policy. Commonwealth brought this declaratory action seeking a judgment from this Court declaring that the Policy does not provide coverage for Credit's claimed damages and losses. (Dkt. 1.) Credit filed counterclaims for declaratory judgment and breach of contract alleging the Policy does cover Credit's claim. (Dkt. 8.)

Commonwealth's Motion for Partial Summary Judgment seeks a ruling on the question of the proper valuation date of the Policy – whether it is the date Credit foreclosed on the Property or the date the loans were issued. (Dkt. 33.) Credit's Motion seeks partial summary judgment on its declaratory judgment and breach of contract claims declaring that coverage exists under both the Zoning and Access Endorsements to the Policy. (Dkt. 34.)

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a completely failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.[1]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require

---

[1] *See also,* Rule 56(3) which provides, in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. V. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

Of course, when applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

## ANALYSIS

### 1. Credit's Motion for Partial Summary Judgment

Credit's Motion seeks partial summary judgment on its declaratory judgment and breach of contract counterclaims finding, as a matter of law, that coverage exists under both the zoning endorsement and the access endorsement. (Dkt. 34 at 2.)

### A. Zoning Endorsement

The Zoning Endorsement states:

1. The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

   a. According to applicable zoning ordinances and amendments, the Land is not classified as: A portion of said land is Rural Remote RR-40, and a portion of said land is Residential R-10, and a portion of said land is Mid-density residential, and a portion of said land is Residential 10 (UIB):

   b. The following use or uses are not allowed under that classification: A portion of said land is Rural Remote RR-40, and a portion of said land is Residential R-10, and a portion of said land is Mid-density residential, and a portion of said land is Residential 10 (UIB);
   ...

2. There shall be no liability under this endorsement based on

   a. Lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses. This Paragraph 2.a. does not modify or limit the coverage provided in Covered Risk 5.

   b. The invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

   c. The refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms an provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of the Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

(Dkt. 1, Zoning Endorsement at 37) (Dkt. 33-6, Zoning Endorsement at 11.)

**MEMORANDUM DECISION AND ORDER - 5**

### (1) The Mountain Overlay District

The Blaine County Code has established the Mountain Overlay District ("MOD") which regulates and limits the development of real property lying in a designated area. (Dkt. 1 at ¶ 16); Blaine County Code Sections 9-4-2(J) and 9-4-6. The MOD essentially prohibits any subdivision of property falling within its defined boundaries. The Property in this case is entirely in the MOD.

Relying on the terms in Paragraph 1 of the Zoning Endorsement, Credit argues it is entitled to coverage under the Policy because Commonwealth failed to identify the Property as being subject to the MOD. (Dkt. 34 at 10-11.) Commonwealth, on the other hand, argues that the exception in Paragraph 2 of the Zoning Endorsement applies to the conditions, restrictions, and requirements of the MOD and, therefore, by its terms, there is no coverage under the Policy. (Dkt. 36 at 6-7.) Specifically, Commonwealth argues the MOD is analogous to a set of building code or development restrictions and, therefore, is not a zoning classification. (Dkt. 36 at 11.) Credit disagrees and argues the MOD is a zoning classification that was required to be identified in the endorsement. (Dkt. 38 at 1.) Pointing to the Blaine County Code Section defining zoning districts, Credit argues the MOD is a zoning district because it is described in the same section of the code as the other zoning districts identified in the Zoning Endorsement.

Having reviewed the relevant sections of the Blaine County Code, the Court finds, under the unambiguous terms of the Zoning Endorsement and Policy, that the MOD is a zoning ordinance; not a development condition, restriction, or requirement. As pointed out

by Credit, Section 9-4-2 of the Blaine County Code lists the zoning districts created by the statute to include the MOD as well as the other zoning districts listed in Paragraph 1 of the Zoning Endorsement. The plain language in the Blaine County Code clearly creates the MOD as one of the county's zoning districts. That it is an "overlay" district does not change the fact that the MOD was created as one of several zoning districts in Blaine County. Therefore, the MOD falls within Paragraph 1 of the Zoning Endorsement.

Even if the Zoning Endorsement were found to be ambiguous in regards to whether the MOD was a zoning classification as contemplated in Paragraph 1, special rules of construction apply to protect the insured. *See Armstrong v. Farmers Ins. Co.*, 205 P.3d 1203, 1206 (Idaho 2009). Whether an insurance policy is ambiguous is a question of law over which the court exercises free review. *Id.* (citation omitted). Because insurance contracts are adhesion contracts that are not typically subject to negotiation between the parties, any ambiguity that exists in the contract is construed most strongly against the insurer and in favor of the insured. *Id* (citing *Arreguin v. Farmers Ins. Co.*, 180 P.3d 498, 500 (Idaho 2008)). Further, insurance contracts are to be construed "in a manner which will provide full coverage for the indicated risks rather than to narrow its protection." *Smith v. O/P Transp.*, 918 P.2d 281, 284 (Idaho 1996). "The burden is on the insurer to use clear and precise language if it wishes to restrict the scope of its coverage." *Arreguin*, 180 P.3d at 500. Applying these principles here, the Court again finds the MOD is a zoning ordinance and/or classification upon the land as contemplated in Paragraph 1 of the Zoning Endorsement.

### (2)   Policy Exclusions

The Property was formerly home to a mining operation commonly referred to as the "Triumph Mine" site. DeNovo purchased the Property, with the loan it obtained from Credit, for the purpose of remediating the mining contamination and developing the land into residential lots. There is no dispute that all of the Property lies within Blaine County's MOD and is subject to its regulations on development of real property. Commonwealth contends that Credit and DeNovo both knew of the development restrictions in Blaine County and, in order to avoid the restrictions, planned to annex the Property into the City of Sun Valley. (Dkt. 36 at 1.) When the annexation efforts failed, Commonwealth asserts, DeNovo defaulted on the loan because it was no longer able to develop the Property as it intended. (Dkt. 36 at 9.)

The parties dispute who had actual knowledge of the MOD prior to the Policy being issued. Regardless, Credit contends this disputed fact is not material to its Motion because the unambiguous language of the Zoning Endorsement required Commonwealth to accurately describe the zoning on the Property regardless of what knowledge Credit may have had. (Dkt. 34 at 5, 12-17) (Dkt. 38 at 3.)[2] Commonwealth counters that its own search did not make it aware of the MOD and, further, that Credit knew of the MOD before closing on the loan but failed to notify Commonwealth. (Dkt. 36.) Credit maintains that Commonwealth cannot establish the defense of misrepresentation, Idaho Code § 41-1811, and that it had no

---

[2] For purposes of this Motion, Credit is willing to assume that Commonwealth did not have actual knowledge of the applicability of the MOD to the Property and that there were references to the MOD in some materials received by Credit. (Dkt. 38 at 3.)

duty to disclose the existence of the MOD to Commonwealth because the information was equally available to both parties. (Dkt. 38 at 6.)

The Court finds that genuine issues of material fact exist concerning this issue that preclude entry of summary judgment. In particular, the factual disputes that go to the issue of whether the exclusions in Paragraph 3 of the Policy apply. For instance, the finder of fact must resolve the material questions as to whether either party knew of the MOD's application to the Property prior to the Policy being issued and whether or not the MOD was recorded in the public records.

Credit claims the factual disputes over what the parties knew of the MOD are irrelevant because the language in the concluding paragraph of the Zoning Enhancement controls over the Policy Exclusions. (Dkt. 38 at 3-7.) That language again states:

> This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

(Dkt. 1 at 37) (Dkt. 33-6 at 11.) This argument turns on whether there is an inconsistency between the Policy and the Zoning Endorsement. Having reviewed the terms of both documents carefully and in their entirety, the Court finds no inconsistency between the express provisions of the Zoning Endorsement and the terms of the Policy.

The Zoning Endorsement provides additional assurance to the insured concerning zoning ordinances and/or classifications that the Property is subject to. The Zoning

Endorsement is silent, however, with regard to disclosures of matters known to the insured but unknown to Commonwealth. Those terms are instead included in the exclusions provisions of the Policy. The Zoning Endorsement itself expressly states that it does not "modify any of the terms and provisions of the policy..." and that the "endorsement is subject to all of the terms and provisions of the policy...." (Dkt. 1 at 37) (Dkt. 33-6 at 11.) Because there is no conflict between the plain language of the endorsement and the exclusions, the terms of the Policy's exclusions are applicable here and the disputed facts concerning what both sides knew of the MOD and/or its application to the Property are all relevant and material to resolving the claim for coverage under the Policy.[2] Accordingly, the Court denies the Motion in this regard.

## B. Access Endorsement

The Property in this case is physically accessible by five different roads. The Policy applicable to the Property includes an Access Endorsement which states:

> The Company hereby assures the Insured
> That said land abuts upon a physically open street known as:
> Triumph Gulch Road
> Karst Drive also known as North Star Road
> United States Forest Service and Bureau of Land Management Road known
> as Courier Gulch Road *(Subject to the United States Forest Service and Bureau of Land Management regulation)* and the Company hereby insures said

---

[2] In reaching this conclusion, the Court notes that any duty or obligation of either party in this case does not sound in tort but, instead, arise from the contractual terms of the Policy itself. *See Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 764 P.2d 423, 425-427 (Idaho 1988) ("We hold that I.C. § 41–2708 does not create a duty in tort upon the part of title insurers to conduct a reasonable search and inspection of title." And "contracts for title insurance and policies are the source of the duties between the parties, not negligence principles.").

Assured against loss which said Assured shall sustain in the event said assurance herein shall prove to be incorrect.

The total liability of the Company under said policy and any endorsements therein shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the conditions and stipulations thereof to pay.

This endorsement is made a part of said policy and is subject to the Schedules and the Conditions and Stipulations therein, except as modified by the provisions hereof.

(Dkt. 1 at 36) (Dkt. 33-6 at 10.) Triumph Gulch Road, is closed to vehicular traffic each year from December 1st to April 30th by virtue of a September 24, 2983 Bureau of Land Management decision. (Dkt. 34 at 5-6.)

Credit's claim for coverage under the Policy argues the unambiguous provisions of the Access Endorsement do not identify any limitation to access upon Triumph Gulch Road, including no mention of the seasonal closure. (Dkt. 34 at 17-18.) Commonwealth denied the claim asserting the Access Endorsement assurances were accurate and the Policy Exclusions apply. (Dkt. 36 at 11-20.)

### (1) Plain Terms of the Access Endorsement

Commonwealth contends that the Policy does not provide coverage for any loss related to Triumph Gulch Road because the Access Endorsement is limited to its terms of assuring the road (1) abuts the property and (2) is physically open. The Access Endorsement does not, Commonwealth asserts, insure any particular access, condition, or right to use the road. (Dkt. 36 at 11-12.) Credit maintains that the plain terms of the Access Endorsement,

in particular the phrase "a physically open street," provide coverage for an impairment of a right of access. (Dkt. 38 at 8.)

When interpreting insurance policies, Idaho courts apply "the general rules of contract law subject to certain special canons of construction." *Arreguin*, 180 P.3d at 500 (citing *Clark v. Prudential Prop. & Cas. Ins. Co.*, 66 P.3d 242, 244 (Idaho 2003)). "The general rule is that, because insurance contracts are adhesion contracts, typically not subject to negotiation between the parties, any ambiguity that exists in the contract 'must be construed most strongly against the insurer.'" *Id.* (quoting *Farmers Ins. Co. of Idaho v. Talbot*, 987 P.2d 1043, 1047 (Idaho 1999) (citation omitted). Where a contract's language is clear and unambiguous, its interpretation and legal effect are questions of law. *Bondy v. Levy*, 829 P.2d 1342 (Idaho 1992). If, however, the language in the insurance contract is "reasonably subject to differing interpretations," then it is ambiguous and will be construed strongly against the insurer. *See Clark*, 66 P.3d at 244; *see also Mutual of Enumclaw Ins. Co. v. Roberts*, 912 P.2d 119, 122 (Idaho 1996).

A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. *See Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1549 (9th Cir. 1989). Whenever possible, the plain language of the contract should be considered first. *See Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1469

(Fed. Cir. 1998); *Leicht v. Bateman Eichler, Hill Richards, Inc.*, 848 F.2d 130, 133 (9th Cir. 1988). The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation. *See Kennewick*, 880 F.2d at 1032. It is up to the insurer to make sure their policy is clear in its restriction of scope. *See Clark*, 66 P.3d at 245. Whether an insurance policy is ambiguous is a question of law to be answered by the Court. *Arreguin*, 180 P.3d at 500.

In this case, the parties both argue the plain terms of the Access Endorsement support each of their positions with Credit drawing support from the common definitions and uses of the words and Commonwealth applying a more literal approach. Given these conflicting interpretations are both reasonable, the Court finds the Policy and the Access Endorsement is ambiguous as to the question of coverage. Thus, the terms are construed as a matter of law in favor of Credit, the insured, and against Commonwealth, the insurer. *See Guenther v. Old Republic Nat. Title Ins. Co.*, No. 1:12-cv-00237-REB, 2013 WL 5424004, at *9-10 (D. Idaho 2013). Applying this construction here, the Court finds as a matter of law that the Access Endorsement provides coverage to Credit where there is no legal right of access to and from the Property on Triumph Gulch Road. Neither side disputes that Triumph Gulch Road is closed annually from December 1 to April 30th. As such, there is no dispute that Credit is denied access to the Property at least during that period of time each year. This determination, however, does not end the inquiry as to whether Credit is entitled to coverage under the Policy.

### (2) Policy Exclusions

Commonwealth argues the Policy Exclusions preclude Credit's claim because the BLM's 1982 decision instituting a seasonal closure of Triumph Gulch Road was not a "Public Record" as defined in the Policy and was not discovered in the title search nor disclosed by Credit. (Dkt. 36 at 14-20.) Credit maintains that the endorsement trumps the exclusions and that it had no duty to disclose information concerning the seasonal closure to Commonwealth. (Dkt. 38 at 7.)

The last sentence of the Access Endorsement makes the endorsement a part of and subject to the conditions and stipulations of the Policy except as modified by the provisions of the endorsement. (Dkt. 1 at 36) (Dkt. 33-6 at 10.) There are, however, no provisions in the Access Endorsement modifying the Policy's Exclusions terms. Thus, the terms of the Exclusions section of the Policy apply here and the factual disputes concerning whether either party had actual knowledge of the seasonal closure and/or if the BLM decision was a public record are material and relevant. Because these genuine issues of disputed fact exist, the Court denies the Motion for Partial Summary Judgment.

## 2. Commonwealth's Motion for Partial Summary Judgment

### A. Valuation Date

The Policy and loan used to purchase and remediate the Property were both issued on October 6, 2008. On that same day, DeNovo also purchased the Property. DeNovo stopped

making payments on the loan in approximately April of 2010.[3] Credit initiated judicial foreclosure proceedings against DeNovo on May 24, 2012. Ultimately, on November 19, 2012, Credit foreclosed and purchased the Property at a sheriff's sale. Credit then filed its claim against Commonwealth under the Policy on December 20, 2012.

Commonwealth seeks a judgment as a matter of law that the proper valuation date for the Policy is November 19, 2012, the date Credit foreclosed on the Property, and a ruling that no evidence of loss or damage not related to that date will be allowed. (Dkt. 33.) Credit, on the other hand, argues the valuation date for determining damages is October 6, 2008, the date the Policy was issued and Credit loaned the money for the purchase of the Property. (Dkt. 35.) Additionally, Credit opposes the request to exclude its expert testimony concerning damages.

In support of its position, Credit points to a recent case out of Arizona which held that the proper date of valuation to measure the lender's actual loss due to title defects is the date the loan was created. (Dkt. 35 at 8-12) (discussing *Equity Income Partners LP v. Chicago Title Ins. Co.*, NO. CV-11-1614-PHX-GMS, 2012 WL 3871505, *3 (D. Ariz. Sep 06, 2012); and *Equity Income Partners LP v. Chicago Title Ins. Co. and Recovery Under a Lender's Title Insurance Policy in a Falling Real Estate Market*, 48 Real Prop. Tr. & Est. L.J. 391 (2013)). The basis for this position turns on the allocation of risks assumed by both parties as well as the benefit of eliminating ambiguity and improving consistency in these cases. *Id.*

---

[3]In July of 2009, DeNovo filed a claim against Commonwealth under the owner's title policy. That claim was settled in November of 2010.

The cases supporting Commonwealth's position argue that lenders do not suffer any loss, and therefore do not have a claim under their title insurance, until the date of foreclosure. *See First American Bank v. First American Transp. Title Ins. Co.*, 759 F.3d 427, 432-33 (5th Cir. 2014); *First Internet Bank of Indiana v. Lawyers Title Ins. Co.*, No. 1:07-cv-0869-DFH-DML, 2009 WL 2092782, at *6 (S.D. Ind. 2009) (discussing *Karl v. Commonwealth Land Title Ins. Co.*, 24 Cal. Rptr.2d 912, 919-20 (Cal. App. 1993)). The reasoning supporting using the date of foreclosure to determine a lender's loss is that "[u]sing an earlier date would necessarily require speculation and estimation about the value of the property before it is even certain whether the lender will suffer a loss, while the date of foreclosure provides a value and loss amount based on a real transaction. This rule to use the date of foreclosure does not systematically favor the insurer or the lender. Market conditions determine which party benefits from the date-of-foreclosure rule." *First Internet Bank*, 2009 WL 2092782, at *6.

In this case, the Policy itself is silent in regards to the valuation date. That fact alone does not make the Policy ambiguous if there is only one reasonable interpretation of the parties' intent. *See First American Bank*, 759 F.3d at 432 n. 11. The cases considering such policies have held both ways – finding such policies to both be ambiguous and unambiguous. *See Id.* at 433 n. 18 and *Equity Income, supra*. This Court finds the Policy in this case is ambiguous as to the valuation date. As such, the Policy is construed against the insurer and in favor of coverage.

Having reviewed the arguments of the parties and the relevant case law, and construing those in favor of the insured, the Court finds that the loss to a lender under a title insurance policy is determined at the date of foreclosure. This is the majority approach to valuing the lender's loss. *See* Joyce D. Palomar, *1 Title Insurance Law* § 10:16, Paying the insured's loss – Date value is to be measured (2014-2015 ed.). The risk allocation discussion supporting this view is applicable in this case because the Policy provides indemnity only to the extent a loss suffered by Credit resulting from a title defect thereby compromising its security interest in the Property. The title insurance policy does not place the risk of a decreasing real estate market upon the insurer. The Policy does not guarantee that the Property was worth the amount of the loan used to purchase it nor that the loan will be repaid. Based on the reasoning in these cases, the Court concludes that the proper valuation date is as of the date the of the loss is realized by the insured – the date of the foreclosure sale. For these reasons, Commonwealth's Motion for Partial Summary Judgment is granted on this issue as stated herein.

**B.    Evidentiary Rulings**

Although the appropriate valuation date is the date of the foreclosure sale, that does not end the inquiry. To calculate the value of the Property in this case, as of the date of foreclosure, the finder of fact will have to consider all available evidence as to the Property's worth. Applicable to this determination is the second portion of Commonwealth's Motion asking that the Court exclude any evidence of loss or damage as of any date other than November 19, 2012 as it is irrelevant and misleading to the jury. (Dkt. 33 at 15.)

As to this initial request, the Court denies Commonwealth's request to exclude evidence of loss or damage as of any date other than November 19, 2012. The request is simply too broad at this stage. The Court will make its evidentiary rulings at trial when it has the opportunity to view the evidence in the context in which it is offered. The Court makes clear, however, that its ruling concerning the proper valuation date will control at trial and only that evidence relevant to the valuation of the Property applicable here will be allowed.

Commonwealth also seeks to specifically strike the appraisal of Joe Corlett, MAI arguing it is irrelevant as it applies a valuation date of October 6, 2008. (Dkt. 33 at 16-17.) Credit does not challenge the request as to Mr. Corlett's testimony but, instead, argues it will offer the expert testimony of Brad Janoush, who performed an appraisal at the request of Commonwealth, to establish loss. (Dkt. 35 at 17.)[4] Commonwealth disagrees asserting that under Federal Rule of Civil Procedure 26(b)(4)(D), Credit cannot rely on the non-testifying expert of its adversary absent exceptional circumstances. (Dkt. 37 at 9.)

Rule 26(b)(4)(D) allows a party to discover facts known or opinions held by a non-testifying expert retained for litigation only upon a showing of exceptional circumstances. *See* Fed. R. Civ. P. 26(b)(4)(D). This Rule essentially creates a non-testifying expert privilege or safe harbor allowing a party the right to keep "facts known or opinions held" by its non-testifying experts secret, i.e. protected from discovery, similar to the work

---

[4] As to Mr. Corlett's report in particular, the Court makes no ruling at this time as to its relevancy or admissibility. That being said, it does not appear that this report is relevant to the damages calculation in this case given the Court's ruling concerning the applicable valuation date.

product doctrine. *See Murray v. Southern Route Maritime, S.A.*, No. C12-1854RSL, 2014 WL 1671581, at *1-3 (W.D. Wash. April 28, 2014) (citing cases). This privilege can, however, be waived where the party knowingly and voluntarily discloses the non-testifying expert's opinions. *Id.* The party asserting the protection bears the initial burden of proving the Rule's protections apply.

Upon that showing being made, the party seeking to discover facts known or opinions held by a non-testifying expert must then prove the existence of exceptional circumstances or waiver. Exceptional circumstances to order the production of non-testifying expert records may be found when it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by any other means, or the object or condition at issue is destroyed or has deteriorated after the non-testifying expert observes it but before the moving party's expert has an opportunity to observe it. *FMC Corp. v. Vendo Co.*, 196 F.Supp.2d 1023, 1046 (E.D. Cal. 2002).

In this case, Commonwealth has identified Mr. Janoush as an expert appraiser and produced his report. (Dkt. 33-2 at ¶ 28.) By doing so, Commonwealth gave up the protections of Rule 26(b)(4)(D). *See Thomas v. Mitsubishi Motors Corp.*, 2014 WL 988785, at *1-3 (D. Utah 2014) (discussing *Brigham Young University v. Pfizer, Inc.*, No. 2:12–mc–143–TS–BCW, 2012 WL 1029304 (D. Utah Mar. 26, 2012) ("once a party designates an expert, the party will have to live with the consequence that the opposing party will likely be given the opportunity to depose the expert or even to call the expert at trial on their own behalf."). Even if Commonwealth chooses to "re-designate" Mr. Janoush as a non-

testifying expert at this stage in the litigation, the facts known and opinions held by Mr. Janoush have already been subjected to discovery. Thus, the Court finds Rule 26(b)(4)(D) does not preclude Credit from calling Mr. Janoush at trial. Further, Commonwealth is not prejudiced by allowing such testimony as it is fully aware of Mr. Janoush's opinions.

Finally, Commonwealth asks that Credit not be allowed to offer any evidence going to the Property's value or damages that was not timely disclosed and argues it is too late to supplement. The Court agrees. Credit has had ample time to secure its witnesses and comply with the discovery deadlines in this case. No further discovery will be permitted.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Plaintiff's Motion for Partial Summary Judgment (Dkt. 33) is **GRANTED IN PART AND DENIED IN PART** as stated herein.

2) Defendant's Motion for Partial Summary Judgment (Dkt. 34) is **GRANTED IN PART AND DENIED IN PART**.

3) The parties are directed to confer with one another and submit a joint notice to the Court as whether they desire to proceed to trial as scheduled on the claims remaining in this action or whether the parties desire to pursue Alternative Dispute Resolution, Mediation, or Judicially Supervised Settlement Discussions. Such notice shall be filed on or before **March 31, 2015**.

SO ORDERED.



DATED: **February 26, 2015**

Honorable Edward J. Lodge
U. S. District Judge